**UNITED STATES of America,**

v.

**Larry SILVEIRA, Defendant.**

**No. CRIM. 01–10385–NG.**

United States District Court,
D. Massachusetts.

Nov. 19, 2003.

John Andrews, Robert M. Strasnick, Andrews & Koufman, LLC, Salem, MA, for Gail Costello (2), Defendant.

Allison D. Burroughs, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

John H. LaChance, John H. LaChance, Attorney at Law, Framingham, MA, for Larry Silveira (3), Defendant.

Tracy Minor, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, for George Campbell (1), Defendant.

## SENTENCING MEMORANDUM

GERTNER, District Judge.

### I. INTRODUCTION

The focus of the government's case against Larry Silveira ("Silveira") was the allegation that he was a conspirator in a wide-ranging and fraudulent telemarketing scheme organized and managed by George Campbell ("Campbell").[1] Silveira was acquitted of these charges.

Silveira, however, was convicted of perjury for one statement before the grand jury in an otherwise entirely true and lengthy presentation. Testifying without counsel, Silveira stated that certain monies given him by Campbell (which he recounted in detail) were loans which were to be repaid, rather than salary. The government had documents suggesting the opposite.

The major issues in Silveira's sentencing concerned, a) the significance of Silveira's trial testimony—whether repeating a statement at trial which the jury found to be false qualifies him for an enhancement for obstructing or impeding the administration of justice under United States Sentencing Guidelines § 3C1.1, and b) the significance of Silveira's grand jury testimony—whether a conviction for false tes-

---

**1.** *See United States v. Costello,* Sentencing Memorandum dated October 28, 2003.

timony with respect to one issue, in an otherwise truthful grand jury recitation, is within the "heartland"[2] of perjury convictions, and if not, whether it warrants a departure from the sentencing guidelines for perjury.

I agreed with the government concerning an enhancement for obstruction of justice, and that enhancement added two points to Silveira's offense score for a total of 14.[3] But while I enhanced Silveira's sentence because his *trial* conduct represented an obstruction of justice under the language of the Guidelines and the relevant case law, I also found that his *offense* conduct—his testimony before the grand jury—warranted a departure under the general departure authority of U.S.S.G. § 5K2.0. I evaluated Silveira's testimony before the grand jury, and the evidence which I had heard at his trial. I reviewed not only the case law of perjury convictions in this and other circuits, but also, as is my wont, the presentence reports of other perjury cases within this jurisdiction.[4] I concluded that all perjury convictions are not alike, that there were factors present in the Silveira case which were unique and properly outside the "heartland" for perjury offenses—where the overwhelming majority of his testimony was accurate, helpful to the government, and arguably incriminating to him (all without the benefit of counsel), where the single untruthful statement was at the margins of materiality, since it did not undermine the government's case against Campbell, and simply served to link Silveira somewhat more directly to the Campbell conspiracy (a conspiracy for which he was acquitted); where the facts

and jury instructions supported a finding, not of wilful misrepresentation, but rather, of a reckless disregard for the facts.

I would have departed downward to a level 12, from a level 14 (in Zone C) to reflect this analysis, but for one additional development, the announcement by the Bureau of Prisons ("BOP") on December 13, 2002, that it would not accept judicial recommendations for community confinement for Zone C offenders. *See Monahan v. Winn,* 276 F.Supp.2d 196 (D.Mass.2003). Accordingly, I departed downward to a level 10, in Zone B, and imposed three years' probation, with ten months in community confinement, and four months in home detention.

## II. FACTS

### A. The Indictment

#### 1. The Campbell Conspiracy

George Campbell, Gail Costello and Larry Silveira were charged in a twenty count indictment with Conspiracy, in violation of 18 U.S.C. § 371 (Count 1); Money Laundering, in violation of 18 U.S.C. § 1956(a)(1) and (a)(2) (Counts 2–14); Mail Fraud, in violation of 18 U.S.C. § 1341 (Counts 15–17); Destruction and Removal of Property to Prevent Seizure, in violation of 18 U.S.C. § 2232 (Counts 18 and 19); and False Declaration, in violation of 18 U.S.C. § 1623 (Count 20). Costello was named in eighteen counts, Counts 1 through 17 and Count 19, but after obviously productive plea negotiations, she was charged with structuring under 31 U.S.C. § 5324, in a single count information. *See*

---

2. "Heartland" is defined *infra*.

3. I declined to depart on extraordinary family circumstances under U.S.S.G. § 5H1.6, or aberrant conduct under U.S.S.G. Ch. 1 Pt. A intro. comment 4(b), or U.S.S.G. § 5K20.

4. Redacted versions of these reports were made available to counsel for both sides.

*United States v. Costello,* No. 01–10385–NG (October 28, 2003).

Far more peripheral to the Campbell operation than was Costello, Silveira was charged only in Count 1 (the conspiracy) and Count 20 (false statement), went to trial on both counts, and was convicted only on the latter.

The initial indictment charged that between October 1995 and December 1997, George Campbell owned and operated a telemarketing operation which solicited funds ostensibly on behalf of various charities. One of these charities was the American Veterans Wish Foundation ("AVWF") which purported to grant the wishes of dying veterans. Although a substantial amount of money was collected, little if any made it to reputable legitimate charitable organizations.

Campbell was in total charge of the operation. Witness after witness described him as controlling, even abusive, screaming when things were not done his way. He intimidated nearly everyone around him, both verbally and even physically.

Campbell's operation involved various "boiler rooms," offices and maildrops in the Northeast, Massachusetts, New Hampshire, Rhode Island and Florida. The boiler rooms used numerous telephone solicitors to give deceptive pitches to solicit donations from prospective donors. Campbell collected the donations through the mail or had couriers retrieve them.

To the extent that anyone had a more substantial role in the operation, it was William Twohig ("Twohig") and Gail Costello ("Costello"). Twohig, at Campbell's direction, had day-to-day responsibility for staffing and running the boiler rooms.

Costello was George Campbell's sister and the bookkeeper for the operation. She received the solicited funds, deposited the funds into bank accounts, arranged to have checks cashed, and moved, or wire-transferred funds from one bank account to another, using nominee names or straws. All of the accounts were in fact controlled entirely by Campbell.

The nominees, or straws, were paid for allowing Campbell to use their names, either a flat rate per week or a percentage of the particular boiler room. The government claimed that Larry Silveira, Costello's codefendant, was in this category.[5]

Once Campbell received the money from the couriers or through the mail, he (and at his direction, Costello) controlled the movement of the funds through an elaborate maze of transfers meant to conceal and disguise his receipt and personal use of a substantial portion of the funds.

During the investigation of the scheme, Costello also participated in deleting files from an office computer, and in destroying documents at a storage facility.

Significantly, Twohig cooperated with the government, and pled guilty in exchange for a government motion for a U.S.S.G. § 5K1.1 departure and a reduced sentence. Costello, despite her relationship to the alleged mastermind, and despite being bookkeeper and involved in many of the scheme's activities, signed a plea agreement which essentially accomplished the same thing—a plea to a one-count superseding information charging her only with structuring.

### B. *Silveira's Role*

At trial, the government tried unsuccessfully to link Silveira directly to the

---

5. Straws, like Silveira, had little or no idea how their names, even their signature stamps, were being used. One witness testified that Campbell referred to such people disparagingly as "beards."

Campbell conspiracy. The testimony which the jury believed, and which I find to be proved based on a preponderance of the evidence, is as follows:

Silveira had been involved in charity work for years before his first communication with Campbell. A veteran himself (a tour of duty in the United States Air Force), based in California, he became Executive Director of California for Veterans, which was an existing bona fide charity (later called American Veterans Assistance Corporation). California for Veterans had a shelter for veterans, provided homeless veterans with food, food kits that they could take with them, bus passes and blankets. When he took over, Silveira sought to expand the existing offerings, to provide shelter for veterans with families. In time, he had more national aspirations, to help veterans in hospitals, particularly dying veterans. He set up the Veterans Wish Foundation to grant wishes to dying veterans. Silveira asked television star Ed McMahon to be a spokesman for these efforts, (ultimately naming the shelter, the McMahon House) and creating an advisory board.

His efforts foundered when one of the fundraisers Silveira had used was investigated by the California authorities.[6] Over thirty wishes were granted in the early 1990's before the charity became defunct.

During the time that the shelter was failing, Silveira used some of his own funds to keep it going, including mortgaging his own house. But even this infusion of funds was unavailing; Silveira and his wife were forced to declare bankruptcy. It was clear that in short order the remaining veterans living there would have to leave.

In 1994, Silveira had the bad judgment to associate himself with Campbell. From Silveira's vantage point in California (Campbell was based in Boston), Campbell seemed like a legitimate fundraiser, capable of revitalizing Silveira's charities.

Twohig testified that he and Campbell took over the California shelter, moved out the few remaining veterans,[7] and set up telemarketing phone rooms. He further reported that he never witnessed any charitable activities while he was there. Silveira agreed; no charitable activities were taking place at that time because his operation had failed. Rather, Silveira hoped to use the space to raise funds to restart the shelter.

Later in 1994, Twohig returned to Massachusetts and Silveira came along to set up other charities. Silveira authorized Campbell to open bank accounts in Silveira's name into which money from the fund-raising activities could be deposited. Silveira also allowed Campbell to use a rubber stamp of his signature. In essence, these accounts were controlled by Campbell. He was the only individual who could remove or deposit funds. The accounts belonged to Silveira in name only; he never saw the statements or had any dealings with the banks. Significantly, Silveira denied giving Campbell permission to use his signature to register enterprises used as solicitors on behalf of charitable organizations and denied knowledge of the day-to-day activities of the fund-raising efforts. Moreover while American Veterans Wish Foundation (AVWF) the successor to Silveira's California for Veterans, did not grant any "significant" wishes, Silveira testified that he believed it would—as its

---

6. There was no evidence linking Silveira to that investigation.

7. Campbell ordered Silveira to ask the last individuals in the shelter to leave. Indeed,

the shelter was only transitional in any event. The evidence suggested that they had stayed long past the target date.

predecessor had done—when it was on its feet.

No government witness contradicted Silveira's account of his charitable work *before* the Campbell contacts. While the government presented evidence seeking to prove that Silveira knew of, and agreed to, the goals of the Campbell scheme, the jury rejected those inferences. I agree with the jury's verdict whether tested by beyond a reasonable doubt or a fair preponderance standard.

### C. *Grand Jury Testimony*

On May 13, 1998, Silveira appeared before a grand jury without a lawyer. Silveira was informed that he was not a target of the grand jury investigation.

Nevertheless, he was given Miranda warnings, told that he could refuse to answer any questions he felt would incriminate him and could request counsel at any time during the proceeding before answering a question. Silveira had not consulted an attorney before or during his testimony. He answered every question posed to him—even at times giving testimony that reflected negatively on his involvement in the activities under inquiry.

He gave a good deal of evidence against Campbell and others described above. He was, in fact, an important witness in the prosecution of the central figures of the scheme. He described his role in setting up certain corporations for Campbell, opening bank accounts for those corporations and giving a signature stamp to Campbell so he could control those accounts either by himself or through Costello.

The statements he made were potentially incriminating to him. Indeed, in addition to his testimony before the grand jury, Silveira volunteered then—and takes the same position today—that he would testify against his codefendants, without a bargain.

The government relied on Silveira's evidence in indicting Campbell and Costello—and Silveira.

Silveira' was indicted and convicted of perjury for claiming that the monies he had received from Campbell (he was shown a series of $400 and $500 checks) were loans and not salary for services. Silveira also admitted that he was given payments from Campbell, and that the payments would be used for funding the charitable organization that Silveira was director of, AVWF, as well as for Silveira's personal expenses. Silveira agreed that if the charity had been successful, he would have expected it to provide him with a substantial stream of income as its salaried director. He further admitted that once the failure of the charity was apparent, he used all of the payments for personal expenses. And he agreed that the total was $77,000 for his work over the course of two years.

### D. *Trial Testimony*

Silveira repeated his grand jury testimony on the stand, that the monies he had received over a period of time from Campbell were loans to help support his family and keep the shelter operating. His testimony was supported by that of his wife.

The government had information that according to the Campbell records, Silveira's payments were treated as salary. He first received a regular $500 weekly, and then a percentage of the funds collected. Some of the cancelled checks said "salary" on them.

Significantly, this testimony—about the regular receipt of funds from Campbell—was incriminating to Silveira, whether or not the money he had been given constituted a loan. The most that the government

would have gotten from the characterization that they comprised salary or "payment for services" was an inference that Silveira was more integrated in the Campbell conspiracy, rather than simply a temporary player.

The jury, confronted with the same evidence as the grand jury—the evidence of Silveira's minor role in the Campbell conspiracy together with the evidence of Silveira's salary—rejected that inference. They had to have concluded that even if these checks were for "salary" they were not sufficient to link Silveira to the conspiracy, since the other links were weak. If anything, it appeared that unbeknownst to him, the other coconspirators were using Silveira as a front for their illegal activities.

## III. GUIDELINE COMPUTATIONS

### A. Obstruction Enhancement

The government seeks a two-level enhancement under U.S.S.G. § 3C1.1 which is triggered if "the defendant *willfully* obstructed or impeded, or attempted to obstruct or impede, the administration of justice" during the course of the proceedings. Application note 4 includes "committing ... perjury" as an example of conduct that warrants the enhancement. *See United States v. Dunnigan*, 507 U.S. 87, 93, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993).[8]

 However, the perjury for which the defendant has been convicted and is being sentenced alone does not trigger the application of the enhancement of U.S.S.G. § 3C1.1. Rather, the defendant must do something else during the course of the prosecution, investigation or trial. As one

court noted, application of U.S.S.G. § 3C1.1 does not amount to double counting where "a defendant interferes with one investigation and then also interferes with a resulting investigation of the interference." *United States v. Lueddeke*, 908 F.2d 230, 234 n. 2 (7th Cir.1990).

Application Note 7 specifically cautions that where the underlying conviction is for perjury, "this adjustment is not to be applied ... except if a *significant further obstruction* occurred .... (*e.g.*, if the defendant threatened a witness during the course of the prosecution for the obstruction offense) (emphases added)."

 The question is whether repeating the perjurious statement during the trial qualifies as a "significant further obstruction." While the Supreme Court acknowledged that "some of our precedents [*e.g.*, the law of contempt] do not interpret perjury to constitute an obstruction of justice unless the perjury is part of some greater design to interfere with judicial proceedings," *United States v. Dunnigan*, 507 U.S. 87, 93, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), it suggests that nothing in the Guidelines or the precedent would bar an obstruction enhancement even when the defendant recited the same allegedly perjurious testimony at trial:

> The enhancement provision is part of a sentencing scheme designed to determine the appropriate type and extent of punishment after the issue of guilt has been resolved. The commission of perjury is of obvious relevance in this regard, because it reflects on a defendant's criminal history, on her willingness to accept the commands of the law and the authority of the court, and on her char-

---

**8.** Perjury, in this context, is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* at 94. While, as I describe below, I believe that the jury found, and the evidence supports, a "reckless disregard" standard—not willful intent, that difference is not relevant to this analysis.

acter in general.... [T]he fact that the meaning ascribed to the phrase 'obstruction of justice' differs in the contempt and sentencing contexts would not be a reason for rejecting the Sentencing Commission's interpretation of that phrase.

*Id.* at 94, 113 S.Ct. 1111.

And that was precisely what happened in *United States v. McCoy,* 316 F.3d 287 (D.C.Cir.2003), where the underlying offense of conviction was perjury:

[Defendant] proposes that '[s]imply repeating precisely the same statements that were the subject of the perjury charges is not the sort of 'significant further obstruction' that can justify Application Note 7's general rule against applying obstruction enhancements to perjury convictions.' We are reluctant to hold that Note 7 gives a defendant license to perjure herself in a criminal proceeding in order to avoid enhanced punishment for, of all things, perjury. Lying under oath to protect oneself from punishment for lying under oath seems to us—and to the Supreme Court—to be precisely the sort of 'significant further obstruction' to which Note 7 refers.

*Id.* at 289 (citing *Dunnigan,* 507 U.S. at 97, 113 S.Ct. 1111 ("It is rational for a sentencing authority to conclude that [under U.S.S.G. § 3C1.1] a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process")).

Under this case law, it is difficult to imagine any situation in which the repetition of a supposedly perjurious statement at trial would not then qualify for this enhancement. If the jury verdict—that when the defendant said certain words under oath he was committing perjury—is to stand, as I concluded it should, then when the defendant says the very same words during trial he will be "lying under oath to protect [himself] from punishment for lying under oath." *Id.* at 289.

### B. *Heartland Departure (§ 5K2.0)*

As described in U.S.S.G. § 5K2.0, and explained in U.S.S.G. Ch.1, Pt. A, intro. comment. 4(b), each category of offense under the Guidelines defines a "heartland" of cases:

The Commission intends the sentencing courts to treat each guideline as carving a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

A word at the outset: How can I conclude that Silveira's perjury is outside the heartland of perjury convictions after having concluded that it was sufficient to trigger an obstruction charge? The analyses of "obstruction" and "heartland" differ. When I evaluated Silveira's *offense conduct*—his statements before the grand jury—I concluded that it was outside the heartland of perjury convictions—because it was only marginally material to the government's investigation and because Silveira's state of mind was at best, a reckless disregard for the truth, rather than intentional lying. On the other hand, when I evaluated his *trial conduct*—which involved the same words—the analysis had a different outcome. By the time of trial Silveira well knew what the government records showed, even if he had been reckless with respect to these facts before trial. He knew where his words fit in the gov-

ernment's case, the importance they had given them.[9]

The heartland analysis focuses attention on the crime—how the defendant's acts compare to others convicted of the same crime. In that regard I will consider the nature of the offense, the case law, and the sentences of other defendants within this jurisdiction.[10]

### 1. *Offense*

The jury was instructed that the perjury charge required a finding of a "knowing" and "material" falsehood under oath. The "knowing" standard was defined as a situation in which "the speaker knew that [the statement] was false or demonstrated a reckless disregard for the truth with a conscious purpose to avoid learning the proof." Furthermore, the "materiality" standard was adequately satisfied if it was found that the statement was capable of or "had the natural tendency of influencing the federal grand jury," even if it had not actually done so.

With respect to the state of mind: Both Silveira and his wife testified. Each noted that however regular the payments from Campbell were and however Campbell characterized them, they saw the arrangement as an interim one until the charities were established. The most likely inference from the evidence at trial—and the most likely jury conclusion—is that Silveira recklessly disregarded the facts that suggested he was receiving a salary, rather than that he made the statement knowing that it was false.

With respect to materiality: Silveira gave considerable evidence against Campbell, and in so doing he clearly incriminated himself. His testimony was incriminating whether the money he received from Campbell constituted a loan to be repaid, or a salary for services rendered. At most, the government could have used the characterization of the monies as "payments for services" to infer that Silveira was integrated in the Campbell conspiracy, and not simply a temporary participant. Significantly, the jury rejected that inference, after they were confronted with the same evidence as the grand jury—the evidence of Silveira's minor role in the Campbell conspiracy together with the evidence of Silveira's salary.

**9.** Commentary to U.S.S.G. § 3C1.1 prior to 1995 suggested that the court is to evaluate "testimony or statements... in a light most favorable to the defendant." U.S.S.G. § 3C1.1, comment (n.1) (1995). The approach suggested that the Court could review the testimony independent of the jury's findings. But that commentary has been narrowly construed, *see United States v. McKeeve*, 131 F.3d 1, 16 (1st Cir.1997) ("In its heyday the now-discarded language never required sentencing courts to resolve all evidentiary conflicts to the defendant's benefit ... a sentencing court ... need only construe allegedly perjurious statements in a defendant-favorable way if such statements are genuinely ambiguous or if the record, after credibility determinations have been made, plausibly supports an innocent interpretation"). In any event, by 1995, the language had been excised altogether.

**10.** The Commission never defined what exact factors brought a case within the heartland. Judges were obliged to carve out what "heartland" meant in the decisional law. Marc L. Miller and Ronald F. Wright, "Your Cheatin' Heart(land): The Long Search for Administrative Sentencing Justice," 2 Buff.Crim. L.Rev. 723 (1999). As two commentators suggested, the appropriate question should be: "Is the harm caused by this offense greater or lesser than the harm caused by the offenses these Guidelines were written for? Is this offender's culpability greater or lesser than the offenders these Guidelines were intended for?" Paul J. Hofer and Mark H. Allenbaugh, "The Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines," 40 Am.Crim. L.Rev. 19, 25 (Winter 2003).

Moreover, whether Silveira was paid by loans or salary was not especially critical to the government's major goal. The government was clearly after *Campbell*. Silveira's perjurious statement did not advance that prosecution one way or the other. In fact, with respect to the anti-Campbell facts that really mattered, Silveira was entirely truthful and complete. He even volunteered to testify for the government, without counsel or a plea agreement.

## 2. Case Law

In *U.S. v. Renteria*, 161 F.Supp.2d 1294 (D.N.M.2001), the court granted a downward departure in a perjury case on heartland grounds. In *Renteria*, the defendant committed perjury when he falsely stated that he did not sign a "consent to search" form during a suppression hearing in an underlying drug conspiracy case. *Id.* at 1295–96. Because this motion ultimately was withdrawn, the court found that the perjury had "no impact." *Id.* at 1295. "Apparently no reported cases have defined the boundary between the heartland of perjury cases and those perjury cases that are atypically less severe in comparison. However, it is difficult, if not impossible, to imagine perjurious testimony milder in its effect and with less of an impact than that given by Mr. Renteria." *Id.* at 1304

The First Circuit has already touched upon the "heartland of perjury" and concluded that the extent of materiality could be a factor removing an individual from the "heartland." *See United States v. Anderson*, 260 F.Supp.2d 310 (D.Mass. 2003) (an upward departure on "heartland" grounds was warranted because the defendant withheld information that was crucial to the integrity of a case). As the court noted:

While the court cannot predict how the jury will decide any issue in the Sampson case, Anderson's false denials of receiving Sampson's call had the potential to deprive the jury of information that could prove material to whether Sampson will be sentenced to death. The death penalty is the ultimate sanction. *See id.* at 316. Silveira's case is at the opposite pole. Silveira's testimony was not important in the case against Campbell, and was on the borders of materiality in the case against Silveira.

## 3. Other Sentences Within this Jurisdiction

When this situation is compared with the specifics of other perjury and obstruction of justice convictions in the District of Massachusetts, it is clear that there are two categories. In one category are cases in which there was an indictment for an *underlying* offense along with a perjury indictment, and the defendant either pled *guilty* or was found guilty of *both* offenses. In such cases the defendant made false statements in which he denied any involvement in the underlying offense in order to escape conviction or indictment for that crime. In essence, the perjury was to cover up the initial crime in its entirety.

Not so with Silveira. While he was indicted on the underlying offense of conspiracy together with perjury charge, he was acquitted on the conspiracy charge. Rather than testifying falsely to cover up his complicity in the conspiracy, Silveira gave testimony that linked him to it. Indeed, the testimony he provided incriminated him more effectively than the supposed false statements ever could. The loan/salary question was one of degree— how central he was to the Campbell operation, not whether he was involved at all.

■ Silveira had no reason to try to cover up his actions because he was told

that he was not a target of the investigation. He came without counsel, and offered to cooperate without a plea agreement.[11]

In the second category are cases in which the defendant is charged only with perjury, in a single count. In each, the false statements were far more central to the government's investigation than the statements at issue here, i.e., the false statements resulted in the grand jury being unable to bring indictments, the false statements wholly denied defendant's involvement in the case being investigated, the false statements covered up communications with those harboring a wanted fugitive, etc.

### (1) Category One: Cases Where the Defendant Was Found Guilty or Pled Guilty to Perjury and the Underlying Offense

In *United States v. Bova*, No. 01–10096, the defendant's denials and accusations were a direct attempt to mislead the court on the main issues in the case and escape responsibility for the crimes with which he was charged. The defendant, as a defense witness in his own case, claimed he had not committed the assaults at issue and that

one of those assaults was committed by an individual who was with him at the time. There were numerous witnesses who provided contrary testimony.

In *United States v. Flemmi*, No. 99–10371, the defendant was found guilty of aiding and abetting, transfer and possession of machine guns, and other offenses. He was also found guilty of giving false statements to a grand jury when he claimed to have no knowledge of and to have never possessed a large stash of guns. In fact, the defendant had been a police officer, knew all about the illegal activities of those under investigation, and had helped conceal a large stash of guns.

In *United States v. Mejia–Pimental*, No. 97–10280, the defendant pled guilty to multiple counts involving the distribution of cocaine and obstruction of justice. He was found to have obstructed justice by giving the court a false name.

In *United States v. DeVito*, No. 96–10339, and *United States v. Sullivan*, 99–10421, defendants pled guilty to the underlying substantive offense of conspiracy to commit mail fraud (Sullivan), conspiracy to distribute cocaine (DeVito), as well as a false statements offense. DeVito claimed he had paid off his mortgage arrearage

---

11. Under *United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977) a grand jury witness is not constitutionally entitled to receive notification of his or her status as a "target" or "potential defendant" in the investigation. In *United States v. Pacheco–Ortiz*, 889 F.2d 301, 306–310 (1st Cir.1989), the Court decided not to suppress testimony because the defendant was not told on the record about his right against self-incrimination nor given warning of his "target" status in violation of Department of Justice guidelines, but the Court voiced their concern and warned about future conduct involving violation of policy. *See id.* at 310–311. The U.S. Attorney's Manual indicates that notwithstanding the lack of a clear constitutional imperative, it is the internal policy of the Department of Justice that tar-

gets of an investigation be given certain warnings before they testify before the grand jury. United States Attorney's Manual 9–11.151. These warnings include notice of the right against self-incrimination and the right to consult with counsel outside the grand jury room. Moreover, the U.S. Attorney's Manual instructs that "Although the [Supreme] Court in *Washington, supra*, held that 'targets' of the grand jury's investigation are entitled to no special warnings relative to their status as 'potential defendant[s],' the Department of Justice continues its longstanding policy to advise witnesses who are known 'targets' of the investigation that their conduct is being investigated for possible violation of Federal criminal law." United States Attorney's Manual 9–11.151.

with family loans when he had really used drug money. He also claimed that he had not been involved in the distribution of cocaine for which he later pled guilty. Sullivan was involved in an insurance billing fraud scheme and claimed that she had never forged signatures on charge slips or asked anyone to sign false charge slips when in fact she had.

### (2) *Category Two: Cases Where There Was No Indictment on an Underlying Offense*

In *United States v. Fichera*, No. 01–10183, the defendant was told that he was the target of the grand jury investigation. He signed affidavits for the FDIC falsely stating that he was not buying the assets on behalf of a prohibited party. Even after the defendant was shown irrefutable evidence that the down payment on the assets had come from a prohibited party and not from his own funds as he had claimed, the defendant took the same position before the grand jury.

In *United States v. Conley*, No. 97–10213 and *United States v. Rakes*, No. 96–10131, because of the defendants' perjury, the government was unable to bring charges against those it was investigating. Conley was a police officer who was subpoenaed to testify to a grand jury about a police chase that resulted in the assault of a plain-clothed African–American police officer by his fellow officers. Conley denied seeing anyone chase the victim and denied seeing the assault at all. His testimony was critical because no other officer had come forward with specific testimony.

In Rakes' case, the defendant had been forced to sell his liquor store by the grand jury targets and received $67,000 cash in exchange. To the grand jury, Rakes false-ly testified that he had sold the store strictly for profit and had received $25,000 in checks for the store. Since there was no evidence of extortion, the investigation ended.

In *United States v. McDonough*, No. 98–10148 and in *United States v. McCusker*, No. 98–10148, both defendants gave false testimony to the grand jury regarding their communications with an individual who was harboring a wanted fugitive and was a fugitive herself. These false statements hindered the grand jury in getting a complete picture of the whereabouts and activities of the fugitive whom they were investigating.

In contrast, Silveira's statements were peripheral. The government was able to secure indictments against its targets, and it assembled much of its case from Silveira's information.

### C. *Community Confinement Issues*

Under U.S.S.G. § 2J1.3, Silveira's base offense level was 12 with a 2 level enhancement for obstructing or impeding the administration of justice under U.S.S.G. § 3C1.1 as directed by application note 2 of U.S.S.G. § 2J1.3. However, on U.S.S.G. § 5K2.0 grounds, I would have granted a downward departure of 2 points resulting in an offense level of 12 in Zone C of the sentencing table. I departed further, to a level 10 and Zone B, because of the Bureau of Prison's unlawful policy with respect to the placement of individuals in Zone C in community confinement. *See United States v. Costello, supra,* and *Monahan v. Winn,* 276 F.Supp.2d 196 (D.Mass. 2003). The goal of my sentence was to put Silveira in the position that he would have been in had the Bureau of Prison's policy not been enacted.[12]

---

**12.** On aberrant conduct: I denied the defendant's motion for a downward departure for aberrant conduct and family circumstance. The language of *U.S. v. Bradstreet,* 135 F.3d

## IV. CONCLUSION

Since Silveira's criminal history category was I, a departure to a level 10 meant a guideline range in the 6–12 months range. In order to replicate a Zone C Sentence, I sentenced Silveira to 3 years' probation with special conditions; a $100 special assessment fee; a $2,000 fine; 10 months' community confinement and 4 months' home detention with electronic monitoring.

**SO ORDERED.**

46 (1st Cir.1998), substantially limited this departure category. A "departure based on a finding that the relevant criminal conduct was a single act of aberrant behavior is appropriate only where the conduct was isolated and is unlikely to recur. Yet one who testifies dishonestly after engaging in felonious dishonesty cannot credibly make either claim. One convicted of criminal dishonesty is therefore not entitled to an aberrant conduct departure if he has testified dishonestly about his criminal conduct." *Id.* at 57. Even though *Bradstreet* articulated the standards prior to the 2000 change in the Guidelines, creating a specific guideline on "aberrant conduct," U.S.S.G. § 5K2.20, its reasoning remains persuasive.

On family circumstances: The First Circuit has dramatically and I would suggest, unfairly, narrowed departures under U.S.S.G. § 5H1.6. *See United States v. Lacarubba,* 184 F.Supp.2d 89 (D.Mass.2002). Given those standards, while I found Silveira's family circumstances to be compelling, I could not conclude they fit within the now applicable standards.