# United States Court of Appeals
## For the First Circuit

No. 04-1003

UNITED STATES OF AMERICA,

Appellee,

v.

LARRY SILVEIRA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Torruella, Dyk,[*] and Howard, Circuit Judges,

John H. LaChance for appellant.
Mark T. Quinlivan, Assistant United States Attorney with
whom Michael J. Sullivan, United States Attorney, was on brief,
for appellee.

October 21, 2005

---

[*]Of the United States Court of Appeals for the Federal Circuit,
sitting by designation.

**HOWARD**, **Circuit Judge**.  Larry Silveira was one of three defendants charged in a twenty-count indictment alleging a fraudulent telemarketing scheme.  Silveira, whose alleged role was peripheral, was charged with conspiracy, see 18 U.S.C. § 371, and with knowingly making a false declaration before a federal grand jury, see 18 U.S.C. § 1623(a).  Following a jury trial, Silveira was convicted only of making a false declaration.

The indictment was the product of a FBI investigation into the activities of George Campbell, the owner and operator of a telemarketing fundraising operation.  The investigation uncovered evidence that, between October 1995 and December 1997, Campbell's telemarketing operation solicited funds ostensibly on behalf of various charities.  Although Campbell's operation collected substantial sums of money, little, if any, made it to a legitimate charitable organization.

Campbell's telemarketing operation involved the use of telemarketing solicitation rooms, or "boiler rooms," and mail drops at various locations throughout the Northeast and in Florida.  At each boiler room, a number of telephone solicitors would contact prospective donors and deliver allegedly deceptive pitches designed to induce charitable donations.  The donations were then collected through the mail or by couriers.

William Twohig, who managed the day-to-day operations at some of Campbell's boiler rooms, testified that Campbell's scheme

-2-

involved identifying charities on whose behalf they could purport to solicit funds, devising a pitch for the solicitation, setting up a boiler room, and hiring and training telemarketers to deliver the pitch. Campbell's sister, Gail Costello, was the bookkeeper for the operation. She received the solicited funds, deposited the money into various bank accounts, arranged to have checks cashed, and moved or wire-transferred funds from one bank account to another using nominees or "straws." The operation was profitable. Twohig testified that one Massachusetts boiler room collected as much as $40,000 per week.

After one of Campbell's corporations was notified that the Massachusetts Attorney General was suing it in connection with improper fundraising tactics, Campbell sought to conceal his participation by using "shell" corporations headed by "straw" owners. A corporation would be created and run by the Campbell operation, and a straw owner would be paid for the use of his name as the president of the corporation. The straw owners were compensated in one of two ways: by a flat rate payment of $500 per week, or by a percentage of the proceeds from a given boiler room.

Silveira had been involved in charity work years before he met Campbell. He was the Executive Director of California for Veterans, a charity that provided homeless veterans with food and shelter. He also established the Veterans Wish Foundation to grant wishes to dying veterans. Although several "wishes" were granted

in the early 1990s, the charity dissolved after its "master fundraiser"[1] was investigated by California authorities.[2]

In 1994, with his charities in California failing, Silveira enlisted Campbell's services as a master fundraiser. Promising to revive Silveira's charities, Campbell and Twohig took over Silveira's California shelter, evicting the remaining veterans housed there in order to set up boiler rooms. In 1995, Silveira founded the American Veterans Wish Foundation (AVWF), a successor to the Veterans Wish Foundation, "to fulfill the last requests of terminally-ill veterans." At Campbell's direction, Silveira also formed two corporations for the purpose of soliciting funds for the AVWF.

In May 1998, Silveira was summoned before a federal grand jury. Although he was told that he was not a target of the investigation, he was informed that he could refuse to answer any questions he felt would incriminate him, and that he could request counsel at any time during the proceedings. Silveira answered every question, providing a good deal of testimony implicating Campbell, the other conspirators, and even himself. He described his role in setting up corporations for Campbell, opening bank

---

[1]According to Silveira, a "master fundraiser" brokers contracts with individual fundraisers and oversees all of the fundraising activities for an organization.

[2]There was no evidence that Silveira was implicated in that investigation.

accounts for those corporations, and effectively surrendering control of those accounts to Campbell. Specifically, Silveira had incorporated Everready Enterprises and Ranick Enterprises, authorized Costello to open bank accounts for the AVWF and Everready Enterprises under his name, and permitted Costello to use a rubber stamp bearing his signature for the purpose of signing checks. Thus, although only Silveira's name appeared on the accounts, Campbell and Costello effectively controlled them.

In response to questions before the grand jury regarding how he was compensated for his role as the director of the AVWF, Silveira stated that he never received any compensation because the charity never got off the ground. He also testified that he never received any payments from Campbell for the use of his name in connection with any solicitation in Massachusetts. Silveira was then shown a series of checks, payable to him, that were drawn on the accounts of Everready Enterprises and Ranick Enterprises in amounts ranging from $193.74 to $619.48. He was also shown several checks from another corporation which, with one exception, were all made payable to Silveira in the amount of $500. Silveira told the grand jury that these payments, totaling approximately $77,000 over two years, were personal loans from Campbell, not payments for services rendered. He stated that the loans were intended to fund the AVWF as well as to help him with his personal expenses. According to Silveira, the money was intended as an advance to

launch the AVWF and he planned to repay Campbell out of the proceeds of Campbell's fundraising for the AVWF. Silveira admitted that once the failure of the AVWF was apparent, he used all the money for personal expenses.

At trial, Silveira repeated his grand jury testimony that the monies he had received from Campbell were loans to help jump-start the charity and to support Silveira and his family. The government, however, presented evidence that, for his services as a straw owner, Silveira was initially paid a regular weekly payment of $500, and was later paid a percentage of the funds collected through the solicitations. Special agents for the IRS and the FBI testified that, in an interview after the grand jury hearing, Silveira admitted that Campbell had paid him for his services as a straw owner. Another government witness, a cousin of Campbell who had worked as a telemarketer in one of the boiler rooms, testified that he had overheard a conversation between Campbell and Silveira in which Silveira agreed to be paid $500 per week for the use of his name. The government presented the checks Silveira had received, some of which bore notations indicating that they were "salary." Silveira did not produce any documentary evidence to support his contention that the payments were loans, such as a promissory note or a record of the loaned amounts, and he acknowledged that there was no defined repayment schedule and that the purported loans were interest-free and unsecured.

The government argued at trial that Silveira was a willing co-conspirator who knowingly participated in the concealment of Campbell's fraudulent telemarketing scheme by acting as a straw owner. It also alleged that Silveira had lied to the grand jury when he testified that the payments from Campbell were loans rather than salary for services rendered. Silveira moved for a judgment of acquittal at the close of the government's evidence, and again at the close of all the evidence. See Fed. R. Crim. P. 29. The court denied the motions and submitted the case to the jury. The jury acquitted Silveira of conspiracy, but found him guilty of making a false declaration to the grand jury.

At sentencing, the district court held that Silveira's misstatements fell outside the "heartland" of perjury convictions and therefore granted him a downward departure. See United States v. Silveira, 297 F. Supp. 2d 349, 351 (D. Mass. 2003). The court determined that the departure was appropriate because "the overwhelming majority of his testimony was accurate, helpful to the government, and arguably incriminating to him," whereas the only untruthful statement was "at the margins of materiality" and "did not undermine the government's case against Campbell." Id. Silveira was sentenced to three years' probation, ten months' community confinement, four months' home detention, and ordered to pay a $2,000 fine and a $100 special assessment. Silveira appeals

from the district court's denial of his motion for judgment of acquittal.

Our review is de novo, see United States v. Singh, 222 F.3d 6, 9 (1st Cir. 2000), and we will affirm the court if "any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." United States v. Campbell, 268 F.3d 1, 6 (1st Cir. 2001).

Under the false declaration statute, the government bore the burden of proving, beyond a reasonable doubt, that Silveira "knowingly [made a] false material declaration" while under oath in a proceeding before a federal grand jury. 18 U.S.C. § 1623(a). "A statement of a witness to a grand jury is material if the statement is capable of influencing the grand jury as to any proper matter pertaining to its inquiry or which might have influenced the grand jury or impeded its inquiry." United States v. Doherty, 906 F.2d 41, 44 (1st Cir. 1990); see also United States v. Gaudin, 515 U.S. 506, 509 (1995). To be material, the statement "need not directly concern an element of the crime" being investigated, "nor need it actually influence the jury." Doherty, 906 F.2d at 44. Because materiality is a mixed question of fact and law for the jury, Gaudin, 515 U.S. at 512-15, a court may only decide the issue, as a matter of law, when no reasonable juror could find materiality on

-8-

the evidence presented, cf. In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 209 (1st Cir. 2005) (holding, in a securities fraud action, that a court may only find the lack of materiality where a jury could not reasonably find materiality).

On appeal, Silveira contends that the government failed to adduce sufficient evidence to submit the perjury count to the jury. He does not challenge the adequacy of the evidence establishing the knowing falsity of his statements, but rather argues that his misstatements to the grand jury were so minor in the context of his entire testimony, and were so insignificant to the subject matter of the grand jury's investigation, that the court should have ruled them immaterial as a matter of law.

Silveira contends that his false statements were elicited from questions that were aimed at discovering whether Campbell was the source of the money that flowed to Silveira and whether the money was used for a charitable purpose. Silveira's answers -- that Campbell was the source of the money and that Silveira used some of it to fund the AVWF but most of it for personal expenses -- were truthful. Thus, according to Silveira, his characterization of the payments as loans, though false, did not obscure the grand jury's line of inquiry. Relatedly, Silveira argues that his single untruth was de minimis in the context of the wealth of helpful information that he gave to the grand jury. Silveira points out that even the district court acknowledged at sentencing that he had

provided significant truthful testimony, and that the false statements were only "marginally material" to the grand jury's investigation. Silveira, 297 F. Supp. 2d at 356.

Silveira also argues that his statements that the payments from Campbell were loans were actually more incriminating than the truth. He contends that the loan scheme he testified to depicted him as being more deeply invested in the telemarketing scheme because the money that he would have owed Campbell would have come from the money raised by Campbell for Silveira's charity. Thus, Silveira argues, his testimony tended to heighten his connection to the conspiracy, not diminish it.

Because "the test for materiality is a broad one," United States v. Scivola, 766 F.2d 37, 44 (1st Cir. 1985), Silveira's arguments fall short. We note the government's argument that, contrary to Silveira's contention, his misstatements had the effect of minimizing his role in the fraudulent scheme because they concealed his role as a straw owner. Indeed, had Silveira testified truthfully that the monies he had received were payments for the use of his name, the grand jury could have inferred that he was an integrated member of the conspiracy and was not simply a temporary or unwitting participant. See Silveira, 297 F. Supp. 2d at 357. But we need not belabor this point because his appeal fails even if we assume arguendo that Silveira's false statements were more incriminating than exculpating.

Silveira's attempt to circumscribe the scope of the grand jury's inquiry does not comport with the law. Silveira argues that the grand jury was only interested in the source of the money and how it was ultimately spent. But, regardless of what the grand jury was actually focused on, given "the wide-ranging investigative function reserved to grand juries, [we] must indulge comparable breadth in construing the materiality of the panel's inquiries." United States v. Nazzaro, 889 F.2d 1158, 1165 (1st Cir. 1989); Doherty, 906 F.2d at 44 ("The Government need only establish a nexus between the false statements and the scope of the grand jury's investigation.") (internal quotation omitted). It was within the province of the grand jury's investigation to learn how the fraudulent scheme worked. See Nazzaro, 889 F.2d at 1165 (finding testimony material because it "had the potential of providing valuable leads as to how [the conspiracy] worked"). Silveira's false statements had the potential effect of confusing the grand jury regarding a critical aspect of the scheme -- i.e., Campbell's use of and compensation of straw owners. Had Silveira testified truthfully, he would have corroborated the testimony of other witnesses establishing that Campbell concealed his participation in the fraudulent fundraising scheme by paying others to act as straw owners. See id. ("[T]estimony which merely

affords leads or corroborative evidence" is material to a grand jury investigation).[3]

Silveira's characterization of the payments as loans also misrepresented the conduct of Campbell, the alleged ring leader of the scheme and the primary target of the investigation. See id. (finding testimony material because it bore on the activities of the "kingfish" of the alleged conspiracy). By testifying falsely, Silveira misled the grand jury not only as to his own role in the scheme, but also as to Campbell's activities and his intent in making payments to Silveira for the use of his name.

For similar reasons, we reject Silveira's contention that his misstatements were so de minimis in the context of his entire testimony as to be immaterial as a matter of law. Although Silveira did provide a good deal of truthful testimony that helped advance the investigation, the cover-up of his role as a straw

---

[3]We also reject Silveira's suggestion that we limit our inquiry temporally -- that the materiality of the statement must be measured at the time that the statement is given. By its very nature, a grand jury investigation is an ongoing process. The veracity or materiality of certain information is often not appreciated until later in the investigation. See United States v. Goquen, 723 F.2d 1012, 1019 (1st Cir. 1983) (holding that defendant's false statement was material even though the grand jury was not certain that the defendant had lied until several weeks later, when three witnesses testified contrary to the defendant); United States v. Stone, 429 F.2d 138, 140 (2d Cir. 1970) (stating that materiality is more readily found in statements made to a grand jury than in "similar evidence offered on an issue in civil or criminal litigation, since the purpose of the investigation is to get at facts which will enable the grand jury to determine whether formal charges should be made against someone rather than prove matters directly at issue").

owner in Campbell's telemarketing scheme "had a natural tendency to obstruct and obfuscate" the grand jury's understanding of the scheme. <u>Id.</u> The district court's statements at sentencing in no way expressed second thoughts about the correctness of its denial of the motion for a judgment of acquittal. The court's downward departure merely acknowledged that this was an atypical case in which Silveira's material false statements were of lesser significance than his material truthful statements. <u>See</u> <u>Silveira</u>, 297 F. Supp. 2d at 356-58.

The judgment of the district court is **<u>affirmed</u>**.