# United States Court of Appeals
## For the First Circuit

No. 12-2259

UNITED STATES OF AMERICA,

Appellee,

v.

PRUDENCE KANTENGWA, a/k/a Prudentienne Kantengwa,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Barron, Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

March 25, 2015

**LYNCH, Chief Judge**.  Prudence Kantengwa, also known as Prudentienne Kantengwa, is a member of a prominent political family allegedly involved in the Rwandan genocide.  She appeals her convictions for perjury and obstruction of justice based on false statements she made in connection with her 2004 application for asylum in the United States and subsequent removal proceedings.  See 18 U.S.C. §§ 1621(1), 1505.  Those false statements concerned (1) her truthfulness on previous immigration documents, in which she had misrepresented her and her late husband's political affiliations and government employment; and (2) the presence of a roadblock outside Hotel Ihuriro (also known as "Hotel Ilhuliro") during her stay there at the start of the genocide.  Unlike her sister, Beatrice Munyenyezi, whose case is also decided this day, there is no evidence that Kantengwa participated in the genocide, only that she "socialized and sympathized" with those who did, and then sought to distance herself from it by lying.  See United States v. Munyenyezi, No. 13-1950 (1st Cir. Mar. 25, 2015).

Kantengwa challenges her convictions on numerous grounds, all aimed at undermining the requisite findings that her statements were material to the immigration judge's decision, and that there was, in fact, a roadblock in front of Hotel Ihuriro while she was there (such that her averments to the contrary were false).  These challenges are based on issue preclusion, sufficiency of the evidence, the adequacy of the jury instructions, and evidentiary

-2-

decisions.[1]  We cannot say the district court committed any error of law or abused its wide discretion.  We <u>affirm</u>.

I.

A.        <u>Rwanda, The Genocidal Spring of 1994</u>

Until civil war broke out in the spring of 1994, Kantengwa lived with her family in Kigali, Rwanda.  Her family was politically active:  She and her husband, Athanase Munyemana, were both members of the then-ruling party, the National Republican Movement for Democracy and Development ("MRND").  Munyemana worked for the government in various senior capacities, including for the Service Central de Renseignment and, after the Service Central de Renseignment was decentralized, as head of its internal intelligence division.  Kantengwa, one of the few female lawyers in Rwanda at the time, served as section chief of the automobile

---

[1]  Kantengwa also filed two pro se motions to dismiss counsel, in which she argued that her convictions should be overturned on the basis of ineffective assistance of counsel.  We make no judgment as to the merits of these claims.  Our case law is well settled that review of fact-specific claims of ineffective assistance of counsel is not appropriate on direct appeal. <u>See</u> <u>United States</u> v. <u>Vázquez-Larrauri</u>, 778 F.3d 276, 293-94 (1st Cir. 2015) (declining to review ineffective assistance of counsel claim on direct appeal "[b]ecause we can only speculate based on this record as to <u>why</u> counsel acted as he did" (citation and internal quotation marks omitted)).  This is in part to allow defendants like Kantengwa to more fully develop a record on their claims in the district court. <u>See</u> <u>United States</u> v. <u>Mala</u>, 7 F.3d 1058, 1063 (1st Cir. 1993) (noting that this "rule has a prudential aspect").

insurance section of the parastatal national insurance company, Sonarwa.[2]

The killings began shortly after President Habyarimana's plane was shot down on April 6, 1994, throwing Rwanda into turmoil and sparking the three-month genocide that would claim the lives of 700,000 to 800,000 Rwandans.[3] Six days later, on April 12, 1994, Kantengwa left Kigali with Munyemana and their children in a military escort and made a harrowing journey to Butare to stay with Kantengwa's sister, Munyenyezi, at Hotel Ihuriro. Munyemana left after one night to join the new government elsewhere. Kantengwa and her children would remain at the hotel for about six weeks, through the end of May 1994.

The genocide was conducted by the party to which Kantengwa and her family belonged. It began with mass slaughters of Tutsis and moderate Hutus in central locations; later, the genocide's perpetrators would use patrols and roadblocks to weed out and kill survivors. The Service de Renseignment, with whom Munyemana held a senior position, was one of the organizations involved in committing the genocide, and many senior members of the MRND were implicated.

---

[2] Parastatal organizations are state-funded companies whose top executives are appointed by the state, but that still enjoy some independence and are not formally part of the government.

[3] Testimony at trial indicates that scholars still do not know who shot down President Habyarimana's plane.

During the first two weeks of the genocide, the people of Butare had largely resisted becoming involved. But on April 19, 1994, the new Rwandan president, Theodore Sindikubwabo, came to Butare and gave a speech that made clear that those who did not support his new regime would be targeted. Those loyal to the new regime, who had already been laying the groundwork for the genocide, responded to the call to action and set up numerous roadblocks.

Among those loyal to the regime were Kantengwa's in-laws and hosts at Hotel Ihuriro: Pauline Nyiramasuhuko, the hotel's owner, and her son, Shalom Ntahobali, who was married to Kantengwa's sister. Dr. Timothy Longman, a professor of political science and an expert on the Rwandan genocide, testified that Hotel Ihuriro is believed to have been the site of one of the more notorious roadblocks that was set up following President Sindikubwabo's speech. The jury found that this roadblock at Hotel Ihuriro was in place by the time Kantengwa left Hotel Ihuriro in late May, and so her statements that there was no roadblock while she was there were false.

Although there is no evidence that Kantengwa participated in the genocide or at the roadblock, she lived, socialized, and sympathized with those who did. For example, her brother-in-law, Shalom Ntahobali, led the Interahamwe militia in creating the roadblock, and the participation of Kantengwa's sister, Munyenyezi,

in the roadblock is the subject of another appeal before this court.  See United States v. Munyenyezi, No. 13-1950 (1st Cir. Mar. 25, 2015).  Kantengwa's attempts to distance herself from this history while immigrating to the United States form the basis of her convictions and this appeal.

B.        Visa & Asylum Applications to the United States

Kantengwa and her family left Rwanda in July 1994 when the opposition gained control of the country, eventually arriving in Kenya.  Beginning in 1995, Kantengwa made several unsuccessful attempts to gain admission to the United States.[4]  But on September 5, 2001, Kantengwa finally received conditional approval for a non-immigrant visa, subject to her completion of a U.S. Department of State security advisory opinion known as the "Rwanda Questionnaire."

The Rwanda Questionnaire assists the U.S. Department of State in screening out genocide participants seeking refuge in the United States.  All Rwandan applicants living outside Rwanda were required to complete the questionnaire to obtain non-immigrant visas.  The State Department used the questionnaire to identify applicants with relevant personal or family ties to political and

---

[4]  Her 1995 application for admission as a refugee was denied because she had been unable to show past persecution or a well-grounded fear of future persecution.  Three subsequent attempts to obtain non-immigrant visas, beginning in September 2000, were also denied.
    Munyemana's application was terminated when he died in late February 1995.

governmental organizations that were implicated in the genocide, including the MRND and Service de Renseignment.  Under department policy, applicants who had such personal or family ties required further investigation to ensure that they were not personally implicated.

In completing the Rwanda Questionnaire, Kantengwa answered two questions falsely.  The first concerned whether she or any immediate family member was ever a member of several specified organizations, including the Service de Renseignment (for which her husband had worked).  The second concerned whether she or any immediate family member was ever a member of a political party, including the MRND (of which she was once a member).  Kantengwa responded "No" to both questions.  The Department of State approved her application, and she received her visa on March 4, 2002.  She subsequently made two brief visits to the United States to speak at a conference and to visit family.

Kantengwa last entered the United States on January 29, 2004, and applied for asylum on March 8, 2004.  She was referred to removal proceedings on March 3, 2005 for having overstayed her visa.

Kantengwa conceded removability for having remained past her authorized visit, but sought relief from removal, again in the form of asylum, as well as in the form of withholding of removal, protection under the Convention Against Torture, and, in the

alternative, voluntary departure. The Boston Immigration Court held six testimonial hearings for the adjudication of these claims. On July 21, 2009,[5] the immigration judge granted Kantengwa's applications for asylum and withholding of removal, and so did not reach her requests for protection under the Convention Against Torture or for voluntary departure. The Board of Immigration Appeals affirmed on June 14, 2010, and later denied the government's motion for reconsideration. Kantengwa's perjury convictions are based on statements she made during these removal proceedings.

C.      Procedural History

On December 18, 2008, the grand jury returned a fifteen-count indictment charging Kantengwa with fraud and misuse of visas, permits, and other documents; perjury; and obstruction of proceedings before departments and agencies. See 18 U.S.C §§ 1546(a), 1621(1), 1505. The government voluntarily dismissed six of these.

At trial, the government offered evidence of Kantengwa's political membership and affiliations, the history of the Rwandan genocide, and direct testimony from one witness about the

---

[5]   The opinion of the immigration judge indicates that there were "substantial delays" between these hearings. These delays were requested by the parties to accommodate Kantengwa's testimony as a defense witness before the International Criminal Tribunal for Rwanda ("ICTR"), to obtain and present additional evidence, and to resolve an investigation into a potential breach of Kantengwa's confidentiality protections under 8 C.F.R. § 1208.6(a).

roadblocks in Butare.  The government also offered satellite images of Butare from late May and early June 1994 through an intelligence officer who explained how to interpret them to recognize cars, obstructions, buildings, and groups of people.  The evidence of the existence and timing of the roadblock at Hotel Ihuriro was offered through one eyewitness, Augustin Iyamuremye, the satellite images, and Dr. Timothy Longman, an expert on the Rwandan genocide.

The government also presented evidence about the various relevant immigration processes.  Four officials who worked with the U.S. Citizenship and Immigration Services ("USCIS") or the Department of State offered testimony about the visa and asylum process, procedures for identifying applicants implicated in the genocide, and various bars to admissibility.  The jury also received an excerpted transcript of the asylum hearings containing the charged perjurious testimony and context.  The jury did not receive the immigration judge's written opinion,[6] or any direct evidence of the standards governing the removal proceedings in which the asylum claim was adjudicated.

The jury convicted Kantengwa on most counts.  Kantengwa was found guilty of both counts of fraud and misuse of visas, permits, and other documents under 18 U.S.C. § 1546(a).  The basis for conviction on Count 1 was Kantengwa's false answers on the

---

[6]  Kantengwa attempted to submit a redacted version of the opinion into evidence, but the district court excluded it as hearsay.

Rwanda Questionnaire in her 2001 visa application about her and her family's political and governmental affiliations. The basis for conviction on Count 2 was Kantengwa's false answer on her 2004 asylum application that she had not committed any crimes, despite having committed fraud in her visa application.

The jury also convicted her on three perjury counts:[7] Count 3, based on her false answers at the August 24, 2006 removal hearing that she had been truthful in all her immigration documents; Count 11, based on her assertion at her June 20, 2007 removal hearing that there was no roadblock at Hotel Ihuriro while she was there; and Count 13, based on a similar assertion about the roadblock she made at her May 16, 2008 removal hearing.

Finally, the jury convicted Kantengwa of obstruction of proceedings before departments and agencies under 18 U.S.C. § 1505 on the same bases as her perjury convictions.

Kantengwa appeals her convictions for perjury and obstruction of proceedings, but not her convictions for fraud and misuse of visas, permits, and other documents.[8]

---

[7] The jury acquitted Kantengwa on the three counts of perjury under 18 U.S.C. § 1621(1) that were based on her statements to the immigration judge about the extent of her and her husband's political affiliations at various times after 1991.

[8] In her two pro se motions to dismiss counsel, Kantengwa argued that her convictions on Count 1 and Count 2 for fraud and misuse of visas, permits, and other documents should be overturned and that counsel should have appealed them. Kantengwa's pro se arguments for overturning the convictions on these counts lack merit. We make no judgment as to whether appellate counsel's

Kantengwa first argues that her convictions should be overturned and the charges dismissed as barred by the doctrine of issue preclusion.  She argues that her removal proceedings resolved both (1) that her inconsistencies were not material, and (2) that her statements concerning the roadblock were not false.  Accordingly, she contends, the government is barred from re-litigating these issues, and the perjury charges (but not her obstruction charges) should have been dismissed.

We review de novo the district court's denial of a motion to dismiss on grounds of collateral estoppel.  See United States v. Lanoue, 137 F.3d 656, 661 (1st Cir. 1998).  Although it is far from clear that an administrative finding of fact can preclude later criminal charges,[9] we do not reach the broader issue.  Collateral

_____

refusal to appeal these convictions constitutes ineffective assistance of counsel, because review of such claims is not appropriate on direct appeal.  See Vázquez-Larrauri, 778 F.3d at 293-94.

[9] See, e.g., United States v. Bustamante, 248 F. App'x 763, 764 (8th Cir. 2007) (per curiam) ("A finding by an administrative law judge [in general] does not preclude a subsequent related criminal prosecution."); United States v. Payne, 2 F.3d 706, 710 (6th Cir. 1993) (per curiam) (holding that proceedings enforcing Postal Service's regulations do not collaterally estop the government in criminal prosecutions); see also United States v. Alexander, 743 F.2d 472, 477 (7th Cir. 1984) (suggesting that permitting collateral estoppel of criminal prosecutions based on administrative decisions may subvert the purpose of administrative adjudication of "provid[ing] an informal and expeditious adjudicatory setting" for regulatory enforcement, undermine the cost-savings of such a system, or distort incentives for when and how to pursue such proceedings).

estoppel does not apply, in any event, on the facts of this case. Cf. United States v. Rodriquez-Estrada, 877 F.2d 153, 157 (1st Cir. 1989) ("[W]e are reluctant to strain to find an estoppel where one side in a criminal case seeks to control the course of the prosecution by reference to an earlier civil case." (citing Standefer v. United States, 447 U.S. 10, 24-25 (1980))).

A.        Issue Preclusion as to Materiality

Contrary to Kantengwa's assertions, the immigration judge's decision that her false statements did not "go to the heart" of her asylum claim is not a finding as to the materiality of those false statements under the criminal statute of prosecution, 18 U.S.C. § 1621(1).[10] The two are distinct standards. The "heart of the matter" rule from immigration law prohibits basing an adverse credibility determination "on inconsistencies in an applicant's testimony that do not go to the heart of [her] claim." Jabri v. Holder, 675 F.3d 20, 24 (1st Cir. 2012). By contrast, a statement is material in a criminal prosecution for perjury under § 1621(1) if it is "material to any proper matter of the [decisionmaker's] inquiry." United States v. Scivola, 766 F.2d

_____

[10]    The "heart of the matter" rule applied to Kantengwa's asylum application because she filed before May 11, 2005. See Jabri v. Holder, 675 F.3d 20, 24 (1st Cir. 2012). This rule has been superseded by the REAL ID Act, which permits consideration of inconsistencies "without regard to whether [the] inconsistency . . . goes to the heart of the applicant's claim" for applications filed on or after May 11, 2005. See id. (alteration in original) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)) (internal quotation marks omitted) (citing 8 U.S.C. § 1231(b)(3)(C)).

37, 44 (1st Cir. 1985) (emphasis added); see also United States v. Moreno Morales, 815 F.2d 725, 747 (1st Cir. 1987) (applying Scivola to 18 U.S.C. § 1621).

The immigration judge's conclusion that Kantengwa's misrepresentations did not go to the heart of her claim was limited to the finding that such inconsistencies did not "provide specific and cogent reasons to conclude that [Kantengwa]'s testimony was incredible with regard to" the grounds of her fear of future persecution, Ying Jin Lin v. Holder, 561 F.3d 68, 72 (1st Cir. 2009), namely, that the government would target her based on her relationship to her late husband (who some believe left her incriminating files) and to her brother (a "well-known member of the opposition").

Indeed, far from deciding that Kantengwa's misrepresentations were immaterial, the immigration judge specifically found that Kantengwa's misrepresentations were material as "adverse factors" counting against granting asylum. That these inconsistencies were not dispositive of the asylum claim -- that, in the words of the immigration judge, a "discretionary denial based on [them] alone [would be] inappropriate" -- does not mean that they were not "capable of influencing . . . the decision of the decisionmaking body." United States v. Gaudin, 515 U.S. 506, 509 (1995); see also United States v. Birrell, 470 F.2d 113, 115 n.1 (2d Cir. 1972) ("[A] mistatement of fact does not need to

-13-

be dispositive of the inquiry in question to be 'material' within the meaning of § 1621."). Kantengwa's removal proceedings cannot bar the government from litigating materiality in a later criminal proceeding because those removal proceedings did not resolve the materiality issue.

B.        Issue Preclusion as to Falsity of Roadblock Testimony

The immigration judge's determination that the government failed to "conclusively establish" that there was a roadblock outside Hotel Ihuriro during the relevant period also does not provide a basis for issue preclusion in the later criminal proceeding.

Collateral estoppel applies only where the "previously decided issues . . . were 'essential to the [earlier] judgment.'" United States v. Ledée, 772 F.3d 21, 31 (1st Cir. 2014) (second alteration in original) (quoting Ríos-Piñeiro v. United States, 713 F.3d 688, 692 (1st Cir. 2013)). The immigration judge expressly stated that the truthfulness of Kantengwa's claim about the roadblock did not affect her finding that Kantengwa's "testimony concerning matters central to her claim [for asylum] necessarily overcomes an adverse credibility finding."

III.

We turn to Kantengwa's arguments that the government failed to establish the materiality of her lies in any event: first, her argument that there was insufficient evidence of

materiality, and, second, that there was reversible error in the jury instructions.

Both arguments center on the lack of "direct evidence about the [legal] standards the [immigration judge] employed in adjudicating her asylum claim." Kantengwa argues that, without such direct evidence, there was insufficient evidence for the jury to find her false statements were material to the immigration judge's decision because they lacked the information necessary to draw conclusions about what that decision was. See Gaudin, 515 U.S. at 512. In the alternative, she argues that the failure to include these standards in the jury instructions made the instructions misleading, and that this error was not harmless. "The two analyses differ," though here the outcomes do not. See United States v. Godin, 534 F.3d 51, 61 (1st Cir. 2008).

A.        Sufficiency of Evidence as to Materiality

A statement is material under § 1621(1) "if it is 'capable of influencing the tribunal on the issue before it.'" Scivola, 766 F.2d at 44 (quoting United States v. Giarratano, 622 F.2d 153, 156 (5th Cir. 1980)) (discussing materiality under 18 U.S.C. § 1623); see also Moreno Morales, 815 F.2d at 747 (applying Scivola to 18 U.S.C. § 1621).

This test "is a broad one." Scivola, 766 F.2d at 44. "The statement need not be material to any particular issue in the case, but rather may be material to any proper matter of the

[decisionmaker]'s inquiry . . . ." Id. (suggesting that this "includ[es] the issue of credibility"). Nor must the statement be dispositive; it is enough that the false statement has the ability to influence the decision or function of the trier of fact, even if it is unsuccessful in doing so. See Birrell, 470 F.2d at 115 n.1.

The scope of what is material varies with context. That scope is particularly broad where the decisionmaker can direct or pursue specific lines of inquiry in response to the defendant's statements. See United States v. Guariglia, 962 F.2d 160, 163-64 (2d Cir. 1992) (discussing the difference in the materiality standard between "investigative setting[s]" and the "trial context").[11] This follows from the definition of materiality: the body of statements that are capable of influencing a decisionmaker in the exercise of her function will depend, in part, on what that function is. Cf. United States v. Newell, 658 F.3d 1, 17 (1st Cir. 2011) (discussing materiality in terms of its ability to affect or influence a government "function").

The scope of what a jury could find material to these removal proceedings is broad. This is in part because an

_____

[11]  Compare, e.g., United States v. Nazzaro, 889 F.2d 1158, 1165 (1st Cir. 1989) (holding that, in light of the "wide-ranging investigative function reserved to grand juries, courts must indulge comparable breadth in construing . . . materiality" (citing Moreno Morales, 815 F.2d at 747)), with Guariglia, 962 F.2d at 163-64 (holding that "the materiality of false trial testimony" before a petit jury depends on its "impact on the factfinder's ultimate verdict," not on "whether the false testimony hinders further inquiry").

immigration judge has discretion as to relief. Even where an applicant otherwise satisfies the requirements for asylum, an immigration judge may deny relief based on a balancing of various "adverse factors," including fraudulently obtaining immigration benefits. See Matter of Pula, 19 I. & N. Dec. 467, 472-75 (B.I.A. 1987) (holding that an immigration judge must consider the seriousness of adverse factors in exercising discretion), superseded in part by statute on other grounds as stated in Andriasian v. I.N.S., 180 F.3d 1033, 1043-44 & n.17 (9th Cir. 1999).

The scope of materiality is also broad for removal proceedings because the immigration judge has a relatively active role in seeking the information she needs to make her decision. In particular, the immigration judge may "elicit testimony" that guides the proceedings, and base her decisions about what lines the parties may pursue on the answers to questions. Cf. United States v. Nazzaro, 889 F.2d 1158, 1165 (1st Cir. 1989) (noting the grand jury's ability to "appropriately elicit testimony"). That is, the function of the immigration judge is not limited to deciding the ultimate issue (even where she has no discretion as to relief), but includes subsidiary decisions governing the scope of the proceedings. Cf. United States v. Doulin, 538 F.2d 466, 470 (2d Cir. 1976) ("A conviction under § 1623 [criminalizing '[f]alse declarations before [a] grand jury or court'] may . . . be

sustained upon a showing that a truthful answer to the grand jury's question could conceivably have furthered its inquiry by providing 'an evidentiary stone in the larger edifice.'" (quoting United States v. Mancuso, 485 F.2d 275, 283 (2d Cir. 1973))).

In light of the standards governing Kantengwa's removal proceedings, the false statements at issue could have been material in at least five different ways: to deciding the ultimate issue of whether discretionary relief is warranted; to determining whether Kantengwa was barred from relief for the persecution of others; to considering whether her use of fraud to enter the country warrants a discretionary denial; to making the threshold determination of credibility; and to guiding the relevant lines of inquiry. See generally 8 U.S.C. § 1158 (governing asylum relief); see also 8 U.S.C. § 1158(b)(2)(A)(i) ("Persecutor's Bar") (stating that asylum relief "shall not apply" to those who "participated in the persecution" of others); Matter of Pula, 19 I. & N. Dec. at 472-75.

The jury is responsible for deciding whether her false statements were material to any of these issues. See Gaudin, 515 U.S. at 523. The government need not show that the immigration judge actually found them material, see United States v. Edgar, 82 F.3d 499, 510 (1st Cir. 1996), or that the immigration judge's decision would have differed had truthful answers been given, see United States v. Silveira, 426 F.3d 514, 518 (1st Cir. 2005). For example, the government did not need to show that the persecutor

bar would have applied had Kantengwa not lied about the roadblock, only that those lies were material to the determination of whether it did.  See Birrell, 470 F.2d at 115 n.1 (noting that a material statement need not be dispositive).  Finally, it is enough that the government present sufficient evidence for the jury to find a statement material to any one of these issues; the government need not pursue them all or present evidence for the jury to understand all of these issues.  See Scivola, 766 F.2d at 44 ("The statement need not be material to any particular issue . . . , [but] may be material to any proper matter of the [decisionmaker]'s inquiry . . . ." (emphasis added)); see also Silveira, 426 F.3d at 518.

B.        The Evidence Supporting Materiality

With these standards in mind, it is clear that the government's evidence of materiality was sufficient.

Our review is de novo.  United States v. Conley, 186 F.3d 7, 19 (1st Cir. 1999).  When examining sufficiency of the evidence,[12] we view the evidence in the light most favorable to the jury's verdict, and "resolve all credibility disputes in the verdict's favor."  Id. (quoting United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995)).  We then ask whether, based on the

---

[12]  "To be precise," Kantengwa claims the district court erred in denying her Rule 29 motion for a judgment of acquittal.  See United States v. Marin, 523 F.3d 24, 27 n.3 (1st Cir. 2008).  "For our purposes, there is no analytical distinction."  Id. (citing United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000)).

evidence so viewed, "a rational factfinder could find that the government proved the essential elements of its case beyond a reasonable doubt." Godin, 534 F.3d at 61 (quoting United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008)) (internal quotation marks omitted). "Defendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000).

The record establishes that the evidence provided the jury with an adequate understanding of the issues before the immigration judge and the role of the immigration judge in the proceedings so as to analyze materiality. Cf. United States v. Moore, 612 F.3d 698, 702 (D.C. Cir. 2010) (holding evidence sufficient to find materiality despite absence of "evidence [introduced] specifically for the purpose of establishing . . . materiality").

The government provided evidence about the basic decisions facing the immigration judge through the testimony of Dorothy Michaud, the Boston Director of USCIS. The jury heard that, to obtain asylum, an applicant must show that she fears persecution in her home country on the basis of one of five protected grounds, and that she is not otherwise barred from admission.[13] The jury also learned that there are factors that may

_____

[13] Kantengwa suggests that this testimony was inapposite because Michaud presented much of this information in discussing refugee status. Her argument is unavailing. Michaud made clear

-20-

render an applicant ineligible for admission even if the applicant satisfies the other requirements for asylum relief, and that one was relevant: having assisted in the persecution of others. The jury heard testimony about what information was relevant to these determinations, and how such information should frame what is asked of the applicant. Finally, that the immigration judge could and did ask follow-up and clarification questions was evident in the excerpted transcript the jury received.

It is not a reach to conclude that Kantengwa's lies about the roadblock, alleged in Counts 11 and 13, were material to the immigration judge's decision about the persecutor's bar. At the very least, the jury could conclude that this lie would have a natural tendency to cut off important lines of inquiry about the roadblock, about her relationship with those involved, and about what did or did not happen at the roadblock (including her participation, if any), that are directly relevant to ensuring that

---

that these standards also apply to asylum.

This testimony is also not undermined by Michaud's expressed uncertainty as to the exact legal standards governing removal proceedings in immigration court. Michaud confirmed that the definition of asylum (including bars to admissibility) that she used as a USCIS officer to process affirmative asylum applications was the same definition used by immigration judges to adjudicate defensive asylum claims during removal hearings in immigration court. This was sufficient for the jury to understand the essential point: the immigration judge needed to decide whether Kantengwa was barred from remaining. See Gaudin, 515 U.S. at 512 (noting that the jury must first determine the decisions to be made).

she was not implicated in the genocide.[14]  What is more, the jury had direct evidence that Kantengwa's false statements about the roadblock not only had this tendency, but <u>actually did</u> cause the immigration judge to prevent government counsel from pursuing these questions.

The evidence was also sufficient to conclude that Kantengwa's false statements alleged in Count 3, that she had been truthful in her asylum application and all other documents, were material to the persecutor bar.  The jury heard testimony about how even seemingly insignificant details, like family ties or travel history, could raise "red flags" about an applicant's implication in the genocide.  But these were the very details that had formed the basis of Kantengwa's visa fraud: her membership in the MRND, and her husband's role in the Service de Renseignment, both organizations implicated in the genocide.  A jury could easily find that lying about having committed visa fraud, where the purpose of that fraud was to conceal these "red flags," was material to the persecutor bar.

We cannot conclude that this evidence, "viewed in the light most favorable to the government, could not have persuaded

---

[14]  Kantengwa does not argue, and so we need not decide, whether a statement that cuts off lines of inquiry is material only if a truthful answer would have led to further "fruitful" investigation.  See United States v. Freedman, 445 F.2d 1220, 1226-27 (2d Cir. 1971).  We are doubtful it would make a difference in any event, assuming that "fruitful" is properly defined.

-22-

any trier of fact of [Kantengwa]'s guilt beyond a reasonable doubt."  Hernández, 218 F.3d at 64 (citations and internal quotation marks omitted).  And so, we must affirm the district court's denial of Kantengwa's Rule 29 motion.  Id.

C.        Jury Instructions on Materiality

We review "claims of instructional error 'under a two-tiered standard: we consider de novo whether an instruction embodied an error of law, but we review for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues.'"  United States v. Symonevich, 688 F.3d 12, 24 (1st Cir. 2012) (quoting United States v. Jadlowe, 628 F.3d 1, 14 (1st Cir. 2010)) (internal quotation marks omitted).  "The district court's refusal to give a particular instruction constitutes error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." Id. (citing United States v. Mercado, 412 F.3d 243, 251 (1st Cir. 2005)).  We review Kantengwa's preserved claims of error for harmlessness, but apply plain error review to claims not preserved. See id.; Estate of Keatinge v. Biddle, 316 F.3d 7, 16 (1st Cir. 2002).

We begin with her preserved claims of error.  Kantengwa objected that the district court's jury instructions concerning

materiality were inadequate because (1) the instructions did not describe the legal standards applicable to her removal proceedings, and (2) the instructions erroneously stated that a statement "need not have been related to the primary subject matter" to be material.[15]   Kantengwa preserved these objections by submitting

---

[15]   The instructions given read, in relevant part (challenged language emphasized):

> With respect to the final element of perjury, you must find beyond a reasonable doubt that the false statement under consideration was material to the proceeding in connection with which the statement was made.  A statement is "material," again, if it had a natural tendency to influence the tribunal before which it was made, in this case the Immigration Court hearing Ms. Kantengwa's asylum claim.  Materiality is demonstrated if a truthful statement could aid a court's inquiry, or if a false statement could hinder it.
>       The statement need not have actually influenced the court, and _need not have been related to the primary subject matter of the proceeding in order to be material_.  Rather, the statement may be material _if it pertained to any proper subject matter of the court's inquiry, including the issue of credibility_.  The government need not prove that the false or misleading information would have resulted in a denial of Ms. Kantengwa's asylum claim, but rather that the disclosure of the fact would have likely influenced the Immigration Court's actions in some material way.
>       Materiality is measured by an objective standard.  The question is not whether the Immigration Judge subjectively considered the false statements to be material, but whether the statements themselves had a natural tendency or potential to influence the Court.

alternative jury instructions that, she argued, addressed these two

issues.[16]  The district court rejected her proposed instructions.

_____

[16]   Kantengwa's proposed jury instructions on materiality, which were rejected, read (citations omitted):

> You have been instructed that to find Kantengwa guilty you must find that the false statement was material to the decision that the decisionmaker was trying to make.  In Counts Three through Eight the decisionmaker was the Immigration Judge.  The Judge's decision was whether Ms. Kantengwa should be removed from the United States or granted asylum, pursuant to the laws and regulations of the United States.  This decision was guided by the laws and regulations of the United States on which I will now instruct you.
> First, in all applications for asylum, the Immigration Judge must make a threshold determination of the alien's credibility.  The law at the time instructed the Immigration Judge that adverse credibility determinations must "pertain to facts central to the merits of the alien's claims, not merely to peripheral or trivial matters."
> To be eligible for asylum, an alien must first demonstrate either past persecution or a well-founded fear of future persecution.
> Even if an alien can demonstrate past persecution or a well-founded fear of future persecution, he or she is not eligible for asylum if he or she "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group or political opinion." This is called the persecutor bar.
> Personal involvement in killing or torture is not necessary in order to determine that someone "ordered, incited, assisted, or otherwise participated" in persecution. However, for the persecutor bar to apply, the person must have done more than simply associate with persecutors; there must have

-25-

Kantengwa argues that this denial was in error, but fails to show that her requested instruction was "integral to an important point in the case." Symonevich, 688 F.3d at 24. She argues that her jury instructions, which present the legal elements of her asylum claim, were necessary to enable the jury to ascertain the decision the immigration judge was trying to make, a prerequisite under Gaudin for determining whether a particular statement was material. See Gaudin, 515 U.S. at 512 (suggesting this is a required "subsidiary question[]" in assessing materiality). She argues that this inclusion is required both as a matter of law, and as integral to her case.

Not so. Kantengwa's argument notwithstanding, the omission of a fuller description of the legal instructions governing removal proceedings was not erroneous because there is no

been some nexus between the alien's actions and the persecution of others, such that the alien can fairly be characterized as having actually assisted or otherwise participated in that persecution.
Finally, a grant of asylum is discretionary on the part of the Immigration Judge. Thus, the final issue the Immigration Judge considered was whether Kantengwa merited asylum as a matter of the judge's discretion.
A fact is "material" if it has a natural tendency to influence or is predictably capable of influencing the decision or decisionmaker to which it was addressed, regardless of whether the decisionmaker actually relied on it.

such requirement; indeed, she has not cited any authority to the contrary.

Nor has Kantengwa demonstrated that the instructions were integral to her case. On the most charitable reading of her arguments, she suggests that the instructions as to the persecutor bar were necessary because the jury needed them to understand that the persecutor bar would not apply to Kantengwa. But this confuses the issue. Whether the persecutor bar actually applies is irrelevant. Cf. Silveira, 426 F.3d at 518. Rather, the jury only needed to understand that the persecutor bar was at issue in the removal proceedings, which the jury knew it undisputedly was.

We do not hold that properly drafted additional instructions along these lines would never be useful. But the trial judge had discretion to conclude the instructions proffered did not meet those standards and, more than that, would be confusing.[17]

Even so, Kantengwa maintains that the instructions actually given were erroneous.

---

[17] Indeed, we reject Kantengwa's argument for another reason. The proffered instructions imply that a statement could only be material if it pertained to one of the legal elements of the immigration judge's decision. But this is incorrect. As discussed, the jury was also entitled to consider whether the statements were material to smaller, incremental decisions the immigration judge needed to make in arriving at her ultimate conclusion. Cf. Scivola, 766 F.2d at 44.

She first objects to the instruction that statements "need not have been related to the primary subject matter of the proceeding" to be material. Though preserved, there is no error. This instruction respects our well-settled law in this circuit:

> The [allegedly perjurious] statement need not be material to any particular issue in the case, but rather may be material to any proper matter of the [decisionmaker]'s inquiry, including the issue of credibility.

Scivola, 766 F.2d at 44 (citations omitted).

Kantengwa also raises, for the first time on appeal, a novel and unclear argument that the instruction as to credibility embodied legal error. She argues that the instruction essentially eviscerated the materiality requirement because, under the court's instructions, any false statement could pertain to credibility. This, she argues, negates the materiality requirement.[18] She made

---

[18] Kantengwa did not make, and so has waived, any argument that this instruction as to credibility was misleading in light of the "heart of the matter" rule governing credibility determinations in Kantengwa's removal hearings. As discussed, this rule greatly restricts which inconsistencies an immigration judge may consider in making her credibility determination, Jabri, 675 F.3d at 24, such that it is not true that any statement that ordinarily would pertain to credibility in other proceedings is material to credibility in removal proceedings. Cf. United States v. Akram, 152 F.3d 698, 701-02 (7th Cir. 1998) (discussing concerns about adoption of a per se rule that statements pertaining to credibility are material). But if Kantengwa had meant to raise this argument by citing the instruction and the omission while arguing that the instructions suggested (misleadingly) that any false statement could be material, she only gestured at it "in a perfunctory manner," and so any argument to this effect is waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation 'to spell out its arguments squarely and distinctly . . . .'" (quoting Rivera-Gomez v. de Castro, 843 F.2d

-28-

no such argument to the trial judge, and we think it self-evident there was no plain error.  We also note the jury acquitted Kantengwa on perjury counts concerning her representations about her and her husband's political affiliations.  Cf. Estate of Keatinge, 316 F.3d at 16.

IV.

The last issue on appeal is whether the district court abused its discretion in admitting the testimony of a professional political scientist and an historical expert on the Rwandan genocide, Dr. Timothy Longman, as to the existence of a roadblock in front of Hotel Ihuriro before Kantengwa's departure at the end of May 1994.[19]  "We review rulings relating to the admissibility of expert-witness testimony for clear abuses of discretion, and will not reverse unless the ruling at issue was predicated on an incorrect legal standard or we reach a 'definite and firm conviction that the court made a clear error of judgment.'" United States v. Corey, 207 F.3d 84, 88 (1st Cir. 2000) (citation omitted) (quoting United States v. Shay, 57 F.3d 126, 132 (1st Cir. 1995)).

631, 635 (1st Cir. 1988))).

[19] Kantengwa also argues that the district court abused its discretion in excluding as hearsay a redacted version of the immigration judge's decision.  This issue has been waived. Kantengwa focused her appellate arguments exclusively on the issue of whether the immigration judge's decision was relevant to any issue in her trial, and, in so doing, failed to address the determination that the decision was hearsay or to even argue that a hearsay exception applies. Cf. United States v. Gonyer, 761 F.3d 157, 166 n.4 (1st Cir. 2014).

The parties do not dispute Dr. Longman's credentials as a political scientist, or that he is an expert on the Rwandan genocide whose testimony generally explaining the use of roadblocks during the genocide might be specialized knowledge relevant and helpful to the jury.[20] Rather, Kantengwa argues that Dr. Longman's testimony about the <u>particular</u> roadblock's existence is

---

[20]     Dr. Longman is a professor of political science and Director of the African Studies Center at Boston University. He received his Ph.D. in political science with a minor in African studies from the University of Wisconsin in 1995. He wrote his doctoral dissertation on religion and the 1994 genocide, for which he conducted research in Rwanda in 1992 and 1993. He was primarily based in Butare.

After completing his Ph.D., he returned to Rwanda in 1995 and 1996 as the Director of the Human Rights Watch's Rwanda field office in Butare. During his year there, he assisted the Human Rights Watch's research on the genocide. In particular, he assisted with researching and conducting interviews for their 1999 book project, <u>Leave None to Tell the Story</u>. Dr. Longman drafted the book's two chapters on the Nyakizu Commune, a commune near Butare, which served as one of the book's three case studies (the other two were Butare and another nearby region). He testified that <u>Leave None to Tell the Story</u> was "sort of the definitive book" on the genocide, and that its lead writer was the late Alison Des Forges, a scholar and human rights activist who won a MacArthur Genius Grant for the book. Much of his work, particularly the materials he gathered, has been used as evidence at the ICTR, and he personally testified in one case.

Following his time with Human Rights Watch in Rwanda, he directed a project at University of California, Berkeley, concerning post-genocide Rwanda. He then held several other academic positions before beginning at Boston University.

Dr. Longman has published dozens of articles and book chapters on the Rwandan genocide, and Cambridge University Press published his 2010 book, <u>Christianity and Genocide in Rwanda</u>. His current scholarship focuses on religion in politics, human rights, and justice issues, with a particular emphasis on Rwanda and the surrounding region. At the time of the trial, he was completing a book on post-genocide Rwanda, titled <u>Memory and Justice in Post-Genocide Rwanda</u>.

inadmissible because his belief that there was a particular roadblock in a particular location at a particular time was based on nothing more than the repetition of out-of-court statements of others. She argues the government impermissibly used his testimony "as little more than a conduit . . . for testimonial hearsay." See United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009); see also Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135-36 (2d Cir. 2013).

The admission of this testimony raises interesting issues. Dr. Longman's conclusions about the existence and timing of the Hotel Ihuriro roadblock were largely based on conversations with people he knew in Butare, twenty to twenty-five formal interviews (not all relevant), and the work of collaborators on a book project. He also testified as to other events in Butare at the time that relied on these materials, as well as other "written sources."[21] Although historical experts may have "specialized knowledge" that can assist the trier of fact and all experts are afforded some leeway with respect to hearsay evidence, Fed. R. Evid. 702, 703, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." Marvel, 726 F.3d at 136 (quoting Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d

---

[21] Dr. Longman testified that the written sources his project generally relied upon included letters and minutes from government meetings gathered from government archives.

558, 666 (S.D.N.Y. 2007)) (internal quotation marks omitted). Rather, as the Second Circuit has observed: "The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events. And the jobs of judging these witnesses' credibility and drawing inferences from their testimony belong to the factfinder." Id.

On the other hand, we recognize that sifting through the many myths and politically charged characterizations in the wake of the Rwandan genocide to determine what the actual events were presents a challenge where historical expertise may be particularly invaluable. Viewing the testimony in this light, Dr. Longman did not merely act as a "conduit" for the testimony of a select few individuals, but gave testimony that could explain the consistency of accounts as to this historical fact about the roadblock at Hotel Ihuriro, despite conflicting versions of other details about what happened in Butare during the genocide. His conclusions about the existence of the roadblock at Hotel Ihuriro seem based in part on the consistency of the accounts, not merely the interviews themselves. And his conclusions about the timing of the roadblock also accord with the consistency of these accounts, the roadblock's notoriety, and the timing of other political events, such as the government's meeting and President's speech on April 19, that brought the full force of genocide to Butare and sparked the quick establishment of major roadblocks run by the MRND militia. This is

consistent with generally accepted historical methodology, see, e.g. United States v. Paracha, 69 Fed. R. Evid. Serv. 130, 2006 WL 12768, at *20-21 (S.D.N.Y. Jan. 3, 2006) (finding historian's method "consist[ing] of gathering multiple sources . . . , including original and secondary sources" to reach conclusions about historical facts to be reliable), and Kantengwa's counsel thoroughly interrogated the evidence so that the jury might be aware of its limitations, cf. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596 (1993). See also M.D. Goodman, Slipping through the Gate: Trusting Daubert and Trial Procedures to Reveal the 'Pseudo-Historian' Expert Witness and to Enable the Reliable Historian Expert Witness -- Troubling Lessons from Holocaust-Related Trials, 60 Baylor L. Rev. 824, 861, 868-69 & n.243 (2008) (citing Paracha, 2006 WL 12768, at *19-21) (suggesting the expert in Paracha "describ[ed] an appropriate methodology" in explaining his reliance on hearsay and other secondary sources). Indeed, there is no suggestion that the adversarial system "skew[ed]" an otherwise reliable historian's testimony. See Goodman, supra, at 872-73. Dr. Longman thus fulfilled the historian's role of "surveying a daunting amount of historical sources," evaluating their reliability, and providing a basis for a "'reliable narrative[] about the past.'" A. Hasani, Putting History on the Stand: A Closer Look at the Legitimacy of Criticisms Levied Against Historians Who Testify as Expert Witnesses, 34 Whittier L. Rev.

343, 354-55 (2013) (quoting M. Howell & W. Prevenier, From Reliable Sources: An Introduction To Historical Methods 2 (2001)); see also Goodman, supra, at 861 (explaining historical experts' role in "gather[ing], analyz[ing], and synthesiz[ing] countless historical documents" may be especially helpful "in cases involving complicated or unfamiliar historical issues").

These features distinguish this case from Marvel Characters, Inc. v. Kirby, 726 F.3d 119 (2d Cir. 2013). In Marvel, the historical experts based their conclusions on "hearsay statements, made by freelance artists in both formal and informal settings, concerning Marvel's general practices towards its artists during the relevant time period." Id. at 136. They then drew on those statements to "speculate as to the motivations and intentions of certain parties," or to "opine on the credibility of other witnesses' accounts." Id. For example, the experts speculated about certain parties' and witnesses' beliefs about whether "material they created was 'work made for hire'" based on these hearsay statements. Id. This is significantly different from expert testimony assessing a particular historical detail (not others' states of mind) in light of the consistency of that detail in testimonial accounts and other corroborative sources about an otherwise contentious historical event, and in light of the narrative consistency of that particular historical detail with other political events in the historical record.

And to the extent that portions of Dr. Longman's testimony merely conveyed hearsay testimony about the timing and existence of the roadblock, the error, if there were error as to those portions, was harmless in this case. Iyamuremye testified as an eyewitness that he saw a roadblock go up on the main road outside the hotel during the week of April 20 and stay up until he left Butare on May 30 -- that is, he testified to the existence of the roadblock during the time Kantengwa was staying in the hotel. He described it as "the main roadblock," and "big," with twenty to thirty people "searching," "checking IDs," and "controlling everyone who was going through." That there was a large roadblock in front of the hotel during this time was supported by additional sources of information. Satellite images from just after Kantengwa left Butare -- along with expert testimony analyzing those images -- indicate obstructions in the road outside the hotel consistent with a roadblock. The roadblock's existence just after Kantengwa left Butare supports the further inference that the same roadblock existed earlier, particularly in light of the unchallenged portions of Dr. Longman's testimony. Dr. Longman testified that the genocide came to Butare on April 19 or 20 and continued during the entire time Kantengwa was at the hotel; he testified to the use of roadblocks in the genocide; and he testified to the role of Kantengwa's brother-in-law and his mother -- the owners and

operators of the hotel -- as key leaders in government and the MRND, and perpetrators of genocide.

The district court "has broad discretion in deciding to admit or exclude expert testimony."  United States v. Paiva, 892 F.2d 148, 160 (1st Cir. 1989).  Because we lack a "'definite and firm conviction that the [district] court made a clear error of judgment,'" we cannot say it abused this broad discretion.  Corey, 207 F.3d at 88 (quoting Shay, 57 F.3d at 132).

V.

We affirm.